329 So.2d 257 (1976)
DEPARTMENT OF LEGAL AFFAIRS, State of Florida, Appellant,
v.
Lee ROGERS, d/b/a American Holiday Association, Appellee.
No. 47502.
Supreme Court of Florida.
February 25, 1976.
*258 Robert L. Shevin, Atty. Gen., and Rodney L. Tennyson, Special Asst. Atty. Gen., for appellant.
Edward S. Jaffry, Tallahassee, for appellee.
Robert A. Chastain, Gen. Counsel; and Robert J. Bishop, Tallahassee, Special Counsel, for Doyle Connor, Commissioner of Agriculture, Tallahassee, amicus curiae.
Robert R. Feagin, III, and Anthony J., McNicholas, III, of Holland & Knight, Tallahassee, for amicus curiae.
Richard E. Gerstein, State's Atty, and Alan E. Krueger, Asst. State's Atty., for the Consumer Frauds Division of the State Attorney's Office of the Eleventh Judicial Circuit of Florida, amicus curiae.
S. Edward Combs and Stephen E. Nagin, Atlanta, Ga., for The Federal Trade Commission, Atlanta Regional Office, amicus curiae.
ROBERTS, Justice.
This cause is before us on direct appeal to review the final judgment of the Circuit Court in and for Leon County, Florida, which directly passes upon the constitutionality of Sections 501.204 and 501.205, Florida Statutes, and finds the same to be unconstitutionally vague and indefinite and an unlawful delegation of legislative authority. We have jurisdiction pursuant to Article V, Section 3(b)(1), Constitution of Florida.
Pursuant to the provisions of Part II of Chapter 501, Florida Statutes, the Department of Legal Affairs filed an amended complaint against appellee, Lee Rogers, doing business as American Holiday Association and charged violation of said statute in that appellee failed to comply with the requirements of Section 501.204, Florida Statutes, because he is wagering with the contestants on the outcome of the contest in violation of the public policy of Florida and since this conduct fails to meet the trade practice standard imposed by the decisions of the Federal Trade Commission and Federal Courts pursuant to the legislative intent of Section 501.204 (2), Florida Statutes. Count II of the complaint charged that the contest conducted by appellee is a game of chance because (1) to choose eight words from among all those appearing on pp. 1-592 of the dictionary that start with the appropriate letters, that are of the required length and that will maximize the contestants score is so difficult that the average person competes by guesswork; and (2) the average person could not through any exercise *259 of skill complete the puzzle in a reasonable amount of time with any certainty of having his score higher than any other contestant's score. Count II charged that appellee failed to comply with Section 501.204, Florida Statutes, because the weekly contests conducted by appellee are lotteries.
The alleged unlawful gambling puzzle game is described in the complaint as follows:
Respondent invites consumers to participate in a puzzle contest like the "Happy Wanderer Puzzle Contest" by completing an elementary word-building puzzle appearing in a newspaper with national circulation. For this first contest, participants need pay no required entry fee. To be eligible for cash prizes of amounts up to $1,000.00, a contestant has only to send his solution to Respondent. Respondent anticipates that 97% of all entrants will correctly solve this first word-building puzzle and that it will require 3 additional tiebreaker puzzles to determine the winner.
A contestant who successfully completes the first puzzle, then receives notification from Respondent of his success. At the same time he receives his first tiebreaker puzzle, he is given an "official entry" blank that permits him to compete for an "extra" first prize simply by paying a stated amount of money. Finally, the contestant receives information about another contest that he can enter while still participating in the first one. In this "quickie" contest, he can pick the prize group for which he wishes to compete.
A contestant who chooses to participate in the second contest must then: solve another elementary word-building puzzle; select the cash group of prizes for which he wants to compete; pay a registration fee determined by the cash group he selected. For cash group I, with grand prize of $500, he must send $1; for cash group II, with grand prize of $1,000, he must send $2; for cash group III, with grand prize of $1,500, he must send $3.
When the contestant has returned a correct solution to the first puzzle of the "quickie contest," he then receives a letter telling him that he is definitely tied for first place and containing the first tiebreaker puzzle. At the same time, Respondent offers the contestant the opportunity to compete for "extra" first prizes, including a $10,000 grand prize. To be eligible for this extra prize money the only additional requirement a contestant must satisfy is payment of the extra fee indicated on the official entry blank.
To continue competing in the "quickie" contest, the contestant must complete the first tiebreaker puzzle. The contestant must choose one of three "Key Words" supplied by Respondent and must write the selected word in the vertical column on the left side of the official entry blank. He must then complete the puzzle by choosing eight words from the "Official Word List." Each word he selects must start with a letter appearing in the vertical column and have as many letters in it as there are spaces in the horizontal row begun by the given letter. Next, the contestant must compute the "official value" of each word he chose by using the "official letter values" given by Respondent. The objective of each contestant is to maximize his score by skillful selection of a "Key Word" and then the eight words from the "Official Word List."
If the contestant successfully completes the more difficult first tiebreaker, he receives tiebreaker puzzle #2 which he must solve to continue competing in the "quickie contest." This time the contestant must select one of five "Key Words" supplied by Respondent and must write the chosen word in the vertical column on the left side of the official entry blank. He must then complete the puzzle by choosing a word that starts with each letter appearing *260 in the vertical column and that has as many letters in it as there are spaces in the horizontal row begun by that letter. Respondent supplies no word list this time. The contestant can choose any such words appearing "as entries in bold face type in the main vocabulary section of the New Merriam-Webster Pocket Dictionary, pp. 1-592." The contestant must then compute the "official value" of each word he chose by using the "official letter values" given by Respondent. The objective of each contestant is to try to score the highest number of points of all contestants by "selecting words from the Dictionary that will give [him] the highest score."
Regardless of the cash group they select or the extra prize for which they compete, all contestants solve the same puzzles.
The value of the prizes for which a contestant competes, however, is determined by the amount of the registration fee he pays.
Each contestant risks his entry fee in the hope that his solution will entitle him to win a prize.
Respondent risks the possibility of having to pay a more substantial prize if a winner has paid one of the larger registration fees. If no winner has chosen to compete for the more valuable cash prizes, Respondent will not be obliged to award them.
Respondent risks the possibility of having to award an "extra" first prize if a first prize winner has paid the requisite fee. If the winner has chosen not to compete for any "extra" first prize, Respondent will not be obliged to award any "extra" first prize.
Respondent's puzzle games operate in such a manner as to appeal to the gambling instincts of the contestants by allowing additional consideration or wagering as contestants become more and more involved in the several levels of each game.
Pursuant to Section 501.2091, Florida Statutes,[1] appellee petitioned for a stay of the administrative proceedings and requested a trial in the circuit court on the issues raised by the enforcing authority. The circuit court accepted jurisdiction and required appellee to file an answer to the charges.
Plaintiff-appellant moved for summary judgment praying that the court declare the word puzzle game to be a gambling device and enjoin its further solicitation and operation on Florida residents.
In motions to dismiss the complaint against him, appellee alleged that the complaint failed to state a cause of action for which relief could be granted in that Sections 501.204 and 501.205, Florida Statutes, constitute unlawful delegations of legislative power, prerogative and authority to an administrative agency in violation of Article III, Section 1, Constitution of Florida; that the circuit court was without jurisdiction of the subject matter since the activity complained of is confined to use of the United States Postal Service and subject to rules and regulations relative thereto to the exclusion of the state authority; and that by basing Count I of the complaint upon alleged violation of Section 501.204, Florida Statutes, is indirectly alleging that the questioned word puzzle contests are in violation of Section 849.14, Florida Statutes, and to say this is a denial of Rogers' right to equal protection under the law.
The cause came on for hearing on appellant's motion for summary judgment on *261 Count I of the amended complaint and on appellee's motions to dismiss. Determining that no genuine issue of material fact existed as to the issues made by Count I of the complaint and answer thereto or as to the constitutional challenge to Sections 501.204 and 501.205, Florida Statutes, and that judgment could be rendered as a matter of law, the trial judge entered final judgment in favor of appellee dismissing the amended complaint against appellee. The trial judge found that the word puzzle game or contest as described in the amended complaint is not a violation of Section 849.08, Florida Statutes, prohibiting games of chance for money or other things of value but rather is a scheme to compete for a purse, prize, or premium in a contest of skill; that the contest is not a scheme involving a stake, bet or wager upon the result of any trial or contest of skill, speed, power, or endurance of man or beast condemned by Section 849.14, Florida Statutes, but rather is the playing of a game in a contest of skill for a prize. As to the constitutionality vel non of Sections 501.204 and 501.205, Florida Statutes, the trial judge concluded that these sections constitute an unlawful delegation of legislative authority.[2] In view of this holding the trial court *262 found Rule 2-9.07, Florida Administrative Code, which states that it is an unfair or deceptive trade practice for a person to engage in any kind of game of skill, contest, sweepstakes, giveaway or other game promotion which requires any kind of entry fee, service charge, purchase or similar consideration in order to enter, to be invalid and void. Explicitly because of his finding of invalidity of the statutes and rules upon which the amended complaint is based, the trial judge dismissed the complaint as to Counts I and II although it is noteworthy that no argument was made on the charge of operation of a lottery.
Detailing the background of the "little FTC act" in order to evidence legislative intent, appellant posits that Section 501.204, Florida Statutes, which provides:

"Unlawful acts and practices. 
(1) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
(2) it is the intent of the legislature that in construing subsection (1) of this section, due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended."
is not unconstitutionally vague or indefinite. The consumer affairs report made to the Governor in 1973 after much study of the consumer market problems in this state recited that although the majority of consumer laws in this state were criminal in nature, this provided little protection to the consumer because of the generally insurmountable barrier of proving criminal intent. Accordingly, the drafters of the report suggested the adoption of Chapter 501, Part II, with emphasis on civil enforcement by the Attorney General, state attorneys, and private citizens. In drafting legislation, appellant asserts that the legislative intent was to state a broad public policy and to delegate to the executive implementing power defined by specified standards. This was to avoid as much as possible the creation of loopholes by unscrupulous businesses whereby they could circumvent the laws. Appellant explains that the sanctions imposed by the "little *263 FTC act" are not criminal in nature but rather consist of injective relief, declaratory relief, damages, and cease and desist orders.[3]
The purpose of the act is explicated therein as follows:
"Purposes; rules of construction.  The provisions of this part shall be construed liberally to promote the following policies:
(1) To simplify, clarify, and modernize the law governing consumer sales practices.
(2) To protect consumers from suppliers who commit deceptive and unfair trade practices.
(3) To make state regulation of consumers sales practices consistent with established policies of federal law relating to consumer protection." Section 501.202, Florida Statutes.
Sub judice, the trial court determined that the subject act is so vague, uncertain and indefinite that one may not know from the statute what he may or may not do. We do not agree. The act is not so vague as to negate its constitutionality by violating substantive due process. Oft-times we have reiterated that it is fundamental that a statute be construed in such a manner so as to effectuate legislative intent and that all doubts as to the validity of a statute be resolved in favor of its constitutionality. A construction of a statute which will give effect to it should be preferred over another which would defect it. McKibben v. Mallory, 293 So.2d 48 (Fla. 1974).
The terminology "unfair methods of competition and unfair or deceptive acts or practices" utilized in the act is the same as employed in the Federal Trade Commission Act and is recommended by the Model Unfair Trade Practices and Consumer Protection Act and the State of Washington adopted the recommended language of the Model Act in its Consumer Protection Act, RCW 19.86.020.[4] Against a constitutional attack on the Washington "little FTC act" on the basis of vagueness, the Supreme Court of Washington upheld the validity of the act. We find no fault in the cogent reasoning of the Washington court in State of Washington v. Reader's Digest Association, Inc., 81 Wash.2d 259, 501 P.2d 290 (1972), wherein that court stated:
"Respondent's theory of retrospective jeopardy does not stand up under scrutiny for another reason. It is based on the false premise that the phrases `unfair methods of competition' and `unfair or deceptive acts or practices in the conduct of any trade or commerce' are *264 so vague that they deny substantive due process.
"Without question, the due process clause of the Fourteenth Amendment requires that people be given notice of what is prohibited. If a statute fails to give fair warning, it is subject to challenge for vagueness or indefiniteness. But, as Mr. Justice Frankfurter commented, what constitutes indefiniteness is itself indefinite:
"There is no such thing as `indefiniteness' in the abstract, by which the sufficiency of the requirement expressed by the term may be ascertained. The requirement is fair notice that conduct may entail punishment. But whether notice is or is not `fair' depends upon the subject matter to which it relates... . That which may appear to be too vague and even meaningless as to one subject matter may be as definite as another subject matter of legislation permits ...

Winters v. New York, 333 U.S. 507, 524, 68 S.Ct. 665, 674, 92 L.Ed. 840 (1948), Frankfurter, J., dissenting.
"`Common intelligence' is the test of what is fair warning:
"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Accord State v. MacDonald, 74 Wash.2d 474, 477-478, 445 P.2d 345 (1968); State v. Galbreath, 69 Wash.2d 664, 668, 419 P.2d 800 (1966).
"In the field of regulatory statutes governing business activities, greater leeway is allowed in applying the test. Papachristou v. Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) and cases cited therein. Thus statutes which employ special or technical words or phrases well enough known to enable those expected to use them to correctly apply them, or statutes which use words with a well settled common law meaning, will generally be sustained against a charge of vagueness. Winters v. New York, supra at page 515, note 4, 68 S.Ct. 665; Connally v. General Constr. Co., supra, at page 391, 46 S.Ct. 126. Furthermore, the United States Supreme Court has treated sympathetically `state statutes that deal with offenses, difficult to define, when they are not entwined with limitations on free expression.' Winters v. New York, supra, at page 517, 68 S.Ct. at page 671.
"Although the constitutional question of the vagueness of section 5 of the FTC Act has not been before the United States Supreme Court, that court, in acknowledging that the act's terms do not admit to precise definition, has said that the meaning of its terms `must be arrived at by what this court elsewhere has called "the gradual process of judicial inclusion and exclusion."' Federal Trade Comm'n v. Raladam Co., 283 U.S. 643, 648, 51 S.Ct. 587, 590, 75 L.Ed. 1324 (1931). Accord Federal Trade Comm'n v. R.F. Keppel & Bro., Inc., 291 U.S. 304, 312, 54 S.Ct. 423, 78 L.Ed. 814 (1934). See also Federal Trade Comm'n v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993 (1920).
"The language of the amended federal act, from which RCW 19.86.020 is taken, has been with us since 1938. The federal courts have amassed an abundance of law giving shape and definition to the words and phrases challenged by respondent. Now, more than 30 years after the Supreme Court said that the phrase `unfair methods of competition' does not admit to `precise definition,' we can say that phrase, and the amended language has a meaning well settled in federal trade regulation law. RCW 19.86.920 *265 directs us to be guided by the federal law. Thus, in interpreting the language of RCW 19.86.020 we must hold that the phrase `unfair methods of competition' and `unfair or deceptive acts or practices' have a sufficiently well established meaning in common law and federal trade law, by which we are guided, to meet any constitutional challenge of vagueness."
Section 501.205, Florida Statutes, provides:
"Rule-making power. 
(1) The department shall propose rules to the cabinet which prohibit with specificity acts or practices that violate this part and which prescribe procedural rules for the administration of this part. Such rules shall be adopted by majority vote of the cabinet. All rules prescribed by the cabinet and administrative actions taken by the department shall be pursuant to chapter 120. The Department of Legal Affairs shall, at least thirty days before the meeting at which such rules are to be considered by the cabinet, mail a copy of such rules to any person filing a written request with the Department of Legal Affairs to receive copies of proposed rules. The Department of Legal Affairs may charge a reasonable rate for providing copies of such rules, which rate shall not exceed the actual cost of printing and mailing.
(2) All substantive rules and regulations promulgated under this part shall be consistent with the rules, regulations, and decisions of the Federal Trade Commission and the federal courts in interpreting the provisions of § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended."
Also at issue here is whether or not Florida's Deceptive and Unfair Trade Practices Act constitutes an improper attempt to delegate legislative authority to the executive branch of government in violation of Article III, Section 1, Constitution of Florida. Since Subsection 501.204(2), Florida Statutes, imposes a clear and definite standard upon the enforcing authority in defining "unfair methods of competition" and "unfair or deceptive" trade practices under Sections 501.204 and 501.205, Florida Statutes, argues appellant, the trial court erred in invalidating these sections as unconstitutional delegations of legislative authority. Section 501.204(2), Florida Statutes, provides that due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the Federal Trade Commission. Generally, the legislature is presumed to have intended to enact a valid and constitutional law and as, aforestated, we will construe a statute, if possible, in such a manner as will be conducive to its constitutionality. Appellant suggests that a mandatory reading of the word "shall" requiring the enforcing and rule making authority to comply with the Federal Trade Law standard in effect on or before the effective date of the law would be such a construction as to preserve the constitutional validity of the act by establishing adequate specific standards to guide the enforcing and rulemaking agency in exercise of powers delegated. We agree and find that the act does not constitute an unlawful delegation of legislative authority but rather conclude that adequate standards have been announced in the act to guide the administrative agency in the exercise of the delegated powers consistent with constitutional dictates. Cf. Dickinson v. State, 227 So.2d 36 (Fla. 1969).
In State v. Atlantic Coast Line R. Co., 56 Fla. 617, 47 So. 969 (1908) relative to delegation of power by the legislature to the railroad commission, this Court stated:
"In recognition of the power and duty of the state, the Constitution expressly accords to the Legislature full power and discretion to pass all laws necessary to prevent abuses, unjust discriminations, *266 and excessive charges by common carriers and others engaged in rendering service of a public nature. To accomplish the purpose designed, the power thus conferred necessarily includes authority to do and provide for the doing of every needful act that is not clearly and plainly violative of some constitutional provision. Every doubt as to constitutionality should be resolved in favor of a legislative act designed to carry out the specific constitutional provision relative to common carriers, where some other provision of the organic law is not plainly and clearly violated.
"Taking these provisions and principles in connection with the salutary governmental purpose designed to be accomplished, and the duty of the court to sustain and enforce the legislative will as expressed, when it is not clearly unconstitutional, it cannot be said that beyond a reasonable doubt the authority given by the Legislature to the Railroad Commission to make reasonable and just rules and regulations for intrastate transportation, for the violation of which rules and regulations a penalty prescribed by the statute may be incurred, is such a delegation of purely and exclusively legislative power, as distinguished from an administrative duty or function, as that the constitutional provisions separating the powers of government into departments and conferring the legislative power of the state upon the Senate and House of Representatives has been clearly violated so as to render the act unconstitutional and nugatory. Railroad Commissioners v. Pensacola & A.R. Co., 24 Fla. 417, text 474, 5 So. 129, 2 L.R.A. 504, 12 Am.St. Rep. 220."
In State v. Griffin, 239 So.2d 577 (Fla. 1970), a declaratory judgment action to determine the constitutionality vel non of the Orange Stabilization Act, against an attack of unconstitutional delegation of legislative authority, this Court enunciated the broad public purpose to be accomplished by the act and explained:
"Obviously, the very conditions which may operate to make direct legislative control impractical or ineffective may also, for the same reasons, make the drafting of detailed or specific legislation impractical or undesirable. This point was made in State v. A.C.L.R. Co., 56 Fla. 617, 47 So. 969 (1908):
`A direct exercise by the Legislature of the police power is in accordance with immemorial government usage. But the subject-matter may be such that only a general scheme or policy can with advantage be laid down by the Legislature, and the working out in detail of the policy indicated may be left to the discretion of administrative or executive officials.'
"This is not to imply that a double standard exists. Even where a general approach would be more practical than a detailed scheme of legislation, enactments may not be drafted in terms so general and unrestrictive that administrators are left without standards for the guidance of their official acts. Dickinson v. State of Florida, 227 So.2d 36 (Fla. 1969). But it should be remembered that our Constitution does not deny to the Legislature necessary resources of flexibility and practicality, and when a general approach is required, judicial scrutiny ought to be accompanied by recognition and appreciation of the need for flexibility.
"The situation here is a case in point. In our view, the subject matter of the Orange Stabilization Act is such that `only a general scheme of policy can with advantage be laid down by the legislature.' But, the Act is also `a law complete in itself' which contains `valid limitations to provide rules for the complete operation and enforcement of the law within its expressed general purpose.'"
*267 Cf. FTC v. Sperry Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972), United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950).
Another aspect of the issue of delegation of legislative authority concerns the question of whether the legislature by the subject act intended to incorporate future (subsequent to the effective date of the statute) decisions of the Federal Trade Commission and federal court decisions. To preserve the constitutional validity of the act, we would have to say that the legislative enactment intended only decisions made prior to its enactment. Cf. State v. Welch, 279 So.2d 11 (Fla. 1973); Freimuth v. State, 272 So.2d 473 (Fla. 1973); Fla. Ind. Com. et al. v. Peninsular Life Ins. Co., 152 Fla. 55, 10 So.2d 793 (1943); Fla. Ind. Com. et al. v. State ex rel. Orange State Oil Co., 155 Fla. 722, 21 So.2d 599 (1945).
Appellee's contention that its word puzzle game, alleged by appellant in its complaint to be an unlawful gambling device, has been approved by the Federal Trade Commission and thus meets the legislative intent of Section 501.204(2), Florida Statutes, is completely without merit. The complaint filed by the Federal Trade Commission against appellee involved deceptive advertising and misrepresentation by appellee. The Federal Trade Commission has filed a brief as Amicus Curiae asserting that appellee has entirely misconstrued the Commission's action, that the Commission's complaint challenged the nature of appellee's advertising on grounds of misrepresentation but did not question whether or not the contest or game was a lottery or unlawful wager. It is readily apparent from the complaint and decision and order of the FTC[5] that it did not constitute approval of appellee's activities. The complaint by the Federal Trade Commission charged: "Therefore the general method of operation, statements, and representations as set forth in paragraph four and paragraph five herein, were and are unfair, false, misleading and deceptive." The Commission takes the position and we agree that the fact that the Commission has not taken a position with respect to whether or not the subject puzzle game is an unlawful wager or lottery does not preclude the State from taking such a posture.
Finally, we determine that Administrative Rule 2-9.07, Florida Administrative Code, promulgated under the authority of Sections 501.204 and 501.205, Florida Statutes, is a valid and reasonable rule.
Accordingly, for the reasons aforestated, we hold that Sections 501.204 and 501.205, Florida Statutes, are constitutional, are not vague and indefinite and do not constitute an unconstitutional delegation of legislative authority. The judgment of the trial court dismissing the amended complaint is reversed and the cause is remanded for further proceeding not inconsistent herewith.
This matter has been considered on the record after two oral arguments before the Court, and a full Court Conference, and being of the view that the foregoing opinion is a final disposition of this litigation, we waive the operation of F.A.R. 3.14 and dispense with the filing of a petition for rehearing and direct the immediate release of the mandate.
It is so ordered.
ADKINS, C.J., and BOYD, OVERTON, SUNDBERG and HATCHETT, JJ., concur.
ENGLAND, J., concurs with an opinion, with which SUNDBERG, J., concurs.
ENGLAND, Justice (concurring).
*268 In Conner v. Joe Hatten, Inc., 216 So.2d 209 (Fla. 1968), this Court held the phrase "unfair trade practices" to be insufficiently precise to survive a constitutional challenge of unlawful delegation of legislative power. The language of the "little FTC act" is, in part, virtually identical. Nonetheless, I agree with my colleagues that the statutory provisions under attack in this proceeding, taken together, are constitutionally valid. I reach this conclusion for somewhat different reasons than my colleagues have articulated.
The trial court below held the key provisions of the "little FTC act" to be unconstitutionally vague. I concede that the language of Section 501.204(1), Florida Statutes (1975), is more in the nature of a declaration of legislative policy than a prohibition of specific conduct. That is not an infirmity of constitutional dimensions in all cases, however.
"The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulating enactments under the police power."[1]
In assessing the Legislature's power to enact such legislation rather than to proscribe one or more enumerated, individual acts, I find the following circumstances persuasive:
(1) The act provides only civil and administrative remedies, as opposed to criminal punishment. Less specificity is tolerable under these circumstances.
(2) The specificity for which appellee argues  the "laundry list" form of prohibited marketplace activities  was present in the law of Florida for years before the little FTC act was enacted.[2] It was wholly inadequate for its intended purposes, despite the presence of both criminal and administrative sanctions. Where the Legislature has pursued a policy, which is indisputably within its purview, by precise and narrow means (a so-called "rifle-shot" approach), courts should generally be reluctant to invalidate amendatory laws which endeavor to accomplish the same legislative purposes by other, more flexible means. Particularly is this true, as here, where the original approach to the problem lacked ostensible success and one principle, documented cause for failure appeared to be the ease by which the legislative targets avoided direct hits.[3]
(3) Those whose conduct the act seeks to govern are merchants, tradesmen, and businessmen, as opposed to citizens and individuals in general. Terms such as those used in Section 501.204(1) have a general meaning in the marketplace for those whose livelihood takes them there every day. A context exists, although not always static, by which proscribed and permitted conduct can be distinguished.[4]
(4) The phrases under attack here are, in my opinion, no less precise than some which had existed in Florida's fraudulent practices statutes without apparent constitutional uncertainty before this enactment. For example, before the little FTC act was passed, the Florida Legislature had five times expressed its disapproval, in some cases with attendant criminal penalties, *269 of "deceptive" and "misleading" advertising and trade practices.[5]
The trial court also held that the little FTC act's critical provisions constitute an unlawful delegation of legislative authority to the executive branch of government. I agree with my colleagues that the trial court erred in so holding although some limiting construction is essential to preserve the act's constitutionality. As the Court stated in State v. Atlantic Coastline Ry., 56 Fla. 617, 47 So. 969, 976 (1908):
"The Legislature may ... enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."
This principle was cited with approval by the Court as recently as 1968.[6]
As regards limitations on the reach of the act, I agree with the majority that it is not necessary to restrict the act, as appellant suggests, solely to unfair and deceptive trade practices as defined by the courts and the Federal Trade Commission on the date our law became effective. That construction would so confine the act as to defeat the legislative purpose for its enactment. The Legislature had already tried that approach and found it wanting. The majority has correctly gone beyond the federally defined areas which existed on October 1, 1973, to accommodate an evolving state policy on marketplace mores. Under the Court's view, with which I generally agree, the little FTC act taken as a whole means:
(1) that Florida's public policy is antagonistic to deceptive and unfair trade practices in all forms, without regard to what prohibited practices may have been experienced or regulated in the federal sphere;
(2) that Florida's public policy should, to the fullest extent possible, be harmonized with federal policy on the same subjects when both jurisdictions consider certain classes of activity without the bounds of acceptable commercial propriety, both for ease of administration and for the prevention of interstitial gaps between interstate and intrastate regulation of the same activities; and
(3) that Florida's declaration of commercial policy need not be made rigid to the point of ineffectiveness, but may be "fleshed out" by administrative action to meet changing circumstances within our borders.
In summary, I conceive that the Legislature has lawfully delegated to the executive branch the enforcement of its announced policy in this area. There is no abuse of that delegation so long as the class of prohibited acts are more specifically defined by prospective administrative action to which the Administrative Procedure Act applies. There is in this legislation no abdication of state legislative power by the automatic adoption of laws or rules to be developed by another legislative body or agency in another forum or jurisdiction.[7]
SUNDBERG, J., concurs.
NOTES
[1] F.S. 501.2091 provides: Stay of proceedings pending trial  Notwithstanding anything in this act to the contrary, any person made a party to any proceeding brought under the provisions of this part by any enforcing authority may obtain a stay of such proceedings at any time by filing a civil action requesting a trial on the issues raised by the enforcing authority in the circuit court in the county of said party's residence. All parties shall be bound by the final order of the circuit court.
[2] Specifically, the trial judge opined:

"3. Turning now to the question of whether or not F.S. 501.204 and 501.205 constitute an unlawful delegation of legislative authority or power in violation of Section 1, Article III of the state constitution, it is concluded that such violation is involved. Part II of Chapter 501 is designated as the Florida Deceptive and Unfair Trade Practices Law. Among its stated purposes are to simplify, clarify and modernize the law governing consumer sales practices, to protect against unfair trade practices, and to make state regulation of consumer sales practices consistent with established policies of federal law relating to consumer protection. F.S. 501.202. In F.S. 501.204 it declares unlawful `... unfair ... acts or practices in the conduct of any trade or commerce ...' Subsection (1). In subsection (2) it declares the intent of the legislature `that in construing subsection (1) of this section, due consideration and great weight shall be given to the interpretation of the Federal Trade Commission and the federal courts relating to Section 5(a) (1) of the Federal Trade Commission Act [15 U.S.C. § 45(a) (1)], as from time to time amended'. F.S. 501.205(1) provides that the Department of Legal Affairs `shall propose rules to the cabinet which prohibit with specificity acts or practices that violate this part ... Such rules shall be adopted by majority vote of the cabinet.' Subsection (2) directs that `All substantive rules and regulations promulgated under this part shall be consistent with the rules, regulations, and decisions of the Federal Trade Commission and the federal courts in interpreting the provisions of Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45 (a)(1)), as from time to time amended'. A rule was promulgated, purportedly pursuant to the statute, which now appears as Rule 2-9.07, Florida Administrative Code, in pertinent part as follows:
"2-9.07 Game Promotion
(1) It shall be an unfair or deceptive act or practice for any person to engage in any kind of a game of skill, contest, sweepstakes, giveaway or other game promotion which:
... ...
(b) requires any kind of entry fee, service charge, purchase, or similar consideration in order to enter;"
"4. It seems well established that the power of the legislature may be delegated to an administrative agency provided that in doing so it announces adequate standards to guide the agency in the execution of the powers delegated. Delta Truck Brokers, Inc. v. King, 142 So.2d 273 (Fla. 1962); Dickinson v. State, 227 So.2d 36 (Fla. 1969). The exact meaning of the requirement of a standard has not been definitely fixed, and it is recognized that the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards. But it is also held that `the legislative exercise of the police power should be so clearly defined, so limited in scope, that nothing is left to the unbridled discretion or whims of the administrative agency charged with the responsibility of enforcing the act'. Dickinson v. State, supra... .
* * * * *
"6. If the standards to be applied are federal court decisions or those of a federal agency to be rendered in the future, the act purporting to specify them would be invalid as an unlawful delegation of legislative prerogative. Fla. Ind. Com. et al. v. Peninsular Life Ins. Co., 152 Fla. 55, 10 So.2d 793; and Fla. Ind. Com. et al. v. State ex rel. Orange State Oil Co., 155 Fla. 722, 21 So.2d 599. The statute under consideration is ambiguous as to whether it is intended that future decisions of federal courts or F.T.C. would be applicable. It will be viewed in its best light as intending only decisions made prior to the enactment of the law. However, this will not save it.
* * * * * *
"7... . Assuming that the contest is gambling within our prohibitory statutes, the language of F.S. 501.204(1) does not specify that such is an unfair or deceptive act or practice in the conduct of any trade or commerce. Such acts are given no definition in the statute, but only an expression of legislative intent that `due consideration and great weight shall be given to interpretations of the certain portions of the Federal Trade Commission Act, dealing with unfair and deceptive trade practices, which are made by the Federal Trade Commission and the federal courts.' Standing alone no one can say with any certainty, from the terms of the statute, what would be deemed an infringement of the law. The F.T.C. and federal court decisions are not to be controlling, even if such could be given a completely certain and consistent interpretation for guidance, but only to be accorded due consideration and great weight, with the implied right to accept or reject such interpretations. The certainty of meaning is to be found in rules proposed by the department and adopted by majority vote of the cabinet, which are directed to be `consistent with rules, regulations and decisions of the Federal Trade Commission and the federal courts interpreting 15 U.S. 45(a)(1), as from time to time amended'. F.S. 501.205. This is a delegation to the department and the cabinet the power to decide what should be and what should not be deemed an infringement of the law. It directs them to ascertain what interpretations the F.T.C. and federal courts have made of a federal law and to avoid inconsistency with their own rules. Thus, it seems clear that the act is so vague, indefinite and uncertain that one may not know from the statute itself what he may or may not do, and there are no adequate guidelines and directions to properly instruct those to whom it would confer rule making power... ."
[3] Cf. Sections 501.207, 501.208, 501.211, Florida Statutes.
[4] Chapter 19.86.020, Revised Code of Washington, provides: "Unfair competition, practices, declared unlawful. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. [1961 c. 216 § 2.]"

Chapter 19.86.920, Revised Code of Washington, provides: "Purpose  Interpretation  Liberal construction  Saving  1961 c. 216. The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or monopolizes trade or commerce or may substantially lessen competition, determination of the relevant market or effective area of competition shall not be limited by the boundaries of the state of Washington. To this end this act shall be liberally construed that its beneficial purposes may be served.
It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest, nor shall this act be construed to repeal by implication the Fair Trade Act contained in chapter 19.89 [RCW]. [1961 c. 216 § 20]."
[5] Docket No. C-2312. Decision and Order  In the Matter of Lee Rogers, an individual trading and doing business as American Holiday Association  issued November 1, 1972.
[1] Dickinson v. State ex rel. Bryant, 227 So.2d 36, 37 (Fla. 1969).
[2] In 1967 the Florida Legislature passed the Uniform Deceptive Trade Practices Act. Chapter 67-349, Laws of Florida. In 1970, the Legislature enacted an Unfair Trade Practices and Consumer Protection Act. Chapter 70-240, Laws of Florida. These appeared as Parts III and IV of Chapter 817, Fla. Stat. (1971).
[3] Consumer Affairs in Florida: A Report to Governor Reubin Askew, Vol. 1, pp. 117-146, 312-13, 325-330 (Mar. 1973).
[4] In a related constitutional analysis, this Court has recognized that standards can be supplied by "common usage or by reference to the purposes of the Act". Conner v. Joe Hatten, Inc., 216 So.2d 209, 213 (Fla. 1968).
[5] Sections 817.06, 817.41, 817.55, 817.71, and 817.77, Fla. Stat. (1971).
[6] Conner v. Joe Hatten, Inc., 216 So.2d 209, 211 (Fla. 1968).
[7] See e.g., Hutchins v. Mayo, 143 Fla. 707, 197 So. 495 (1940).