496 So.2d 930 (1986)
LOXAHATCHEE RIVER ENVIRONMENTAL CONTROL DISTRICT, Appellant,
v.
SCHOOL BOARD OF PALM BEACH COUNTY, Appellee.
No. 85-1743.
District Court of Appeal of Florida, Fourth District.
October 29, 1986.
*931 W. Jay Hunston, Jr., of DeSantis, Cook, Gaskill & Silverman, P.A., North Palm Beach, for appellant.
*932 Richard L. Oftedal, West Palm Beach, for appellee.
Phillip C. Gildan, of Nason, Gildan, Yeager & Gerson, P.A., West Palm Beach, for amicus curiae, Palm Beach County.
Judith A. Brechner, Gen. Counsel, and Herbert D. Sikes, Counsel, State Bd. of Educ., Tallahassee, for amicus curiae, Fla. Dept. of Educ.
GLICKSTEIN, Judge.
Appellant was the defendant in an action for declaratory and injunctive relief brought by the appellee/plaintiff. We affirm the trial court's judgment.
In September 1981 the Palm Beach County School Board was in process of building a middle school in Jupiter, within the area served by the Loxahatchee River Environmental Control District's sewer system. The sewer system did not at the time reach the middle school property, but the School Board wished to be included at such time as the sewer system was constructed in that part of the area. In response to the School Board's request in this vein, the Environmental Control District requested the School Board to execute a Developer's Agreement supplied by the Environmental Control District. Under the terms of this agreement the School Board would have to pay, upon signing the agreement, $27,969 to the Environmental Control District. This sum consisted of $7,344 as the equivalent of twelve monthly service availability standby (SAS) charges for seventy-five equivalent connections, plus $20,625 as line charges at the rate of $275 per equivalent connection. The School Board would additionally pay monthly service availability standby charges, quarterly in advance, until the School Board had paid in full $650 per equivalent connection. Basically this expenditure would buy for the School Board the right to make actual physical connection to the wastewater system to the extent of seventy-five equivalent connections when the system reached the middle school property. The School Board would build the wastewater facilities on the property and deed them to the Environmental Control District. The form was apparently created for use in agreements between the Environmental Control Board and real estate developers, particularly those subdividing property into one-family lots.
The School Board refused to execute the proposed agreement or pay any charges to the Environmental Control Board. Instead, on November 19, 1981, the School Board filed a claim for declaratory and injunctive relief. The School Board contended that pursuant to Section 235.26(1), Florida Statutes (1981), it was exempt from these charges.
The Environmental Control Board answered and stated eight affirmative defenses. It denied that the School Board was exempt. The affirmative defenses included assertions that the School Board had failed to state a cause of action; that there was an adequate remedy at law, and that the cited statutory section, as the School Board interpreted it, was unconstitutional on six stated grounds  inadequate title, void for vagueness, discrimination against publicly owned utilities, unlawful taking, improper alteration of the special act by which the Environmental Control Board was created, and violation of the principle of comity between separate governmental agencies.
The Environmental Control Board also contended that what it was seeking to collect was not impact fees or service availability fees as proscribed in the subject statutory section. The Environmental Control Board contended the SAS charges were based on the fixed cost of operating the portion of the sewage system facilities to be reserved by the School Board, and the line charges were based on actual projected cost of providing the middle school the necessary sewage lines and lift station facilities. The Environmental Control Board argued also that the connection charges were based on an immediate specific requirement for capital improvement, expansion and installations the system had to have in order to accommodate the middle school's wastewater service needs.
*933 On March 18, 1982, the parties entered into a stipulation, subsequently approved by the trial court, under which the School Board would pay the Environmental Control Board, under protest, the SAS charges and the line charges, and subsequently, as they fell due in the future, the connection charges, as stated in the developer's agreement. The School Board also stipulated it was not challenging the monthly service charges that would become due at such time as the middle school would actually be hooked up to the wastewater system.
It was agreed in the stipulation that the questions being submitted to the trial court for decision were (1) the constitutionality of section 235.26(1), Florida Statutes; and (2) whether the statutory phrase "impact fees or service availability fees" comprehends any or all of the Environmental Control Board's charges or assessments, exclusive of the monthly service charges.
It was also agreed that the money the School Board was paying to the Environmental Control Board would be invested in six month Treasury Bills, and the prevailing party would get all the money, after court decision and any subsequent appeal. The School Board paid the money, and it was invested as agreed.
The case was tried without a jury. The trial court decided, inter alia, the following:
1. The SAS charge is a service availability fee, and a charge for an intangible service for which there is no clearly established cost.
2. The line charge is a fee for installation of a contiguous utility line.
3. The plant connection fee is a charge for connection into the Environmental Control Board's system for which there is necessitated no immediate specific requirement for a capital improvement, expansion or installation at the utility source.
4. No service was available in 1981 nor at the time of the decision, the School Board built and operates its own facility, and all fees for which service was not given would thus constitute intangible services which are not clearly established at a cost.
Because of the above findings, the trial court said the subject fees were impact fees of the kind from which the subject statutory section exempted the school board. The court granted the School Board the permanent mandatory injunction it sought to protect it from paying these fees, and its request for declaratory relief. The trial court found section 235.26(1), Florida Statutes, to be a constitutional exercise of power by the legislature. The trial court said that the School Board will have the right to hook into the wastewater system when it reaches the school environs without paying any impact or service availability fees.
The Environmental Control Board timely appealed.
The issues, restated in part, are as follows:
I. Whether the trial court erred in finding that section 235.26(1), Florida Statutes (1981), is a constitutional exercise of the legislature's power. We conclude it did not.
II. If section 235.26(1), Florida Statutes (1981), is constitutional, whether the trial court erred in finding that appellant's service availability (SAS) charges, line charges and plant connection charges are impact fees or service availability fees from which the statute exempts appellee. We conclude it did not.
Because we believe it more logical, and since we would not ordinarily address a constitutional issue unless forced to do so, we will discuss the issues in the reverse sequence presented by appellant.

I

IMPACT OR SERVICE AVAILABILITY FEES
Appellant's position, as we understand it, is that even if the statutory amendment exempting public school facilities from impact and service availability fees is constitutional, that amendment really does not *934 apply to the particular fees here at issue. Those fees are identified as service availability standby (SAS) charges, and line charges.
The parties agree that the definition of the fees to which the exemption applies is that found in Rule 6A-2.01(45), Florida Administrative Code, which provides:
(45) Impact or service availability fees. A fee, tax, user charge or assessment imposed by a municipality or other governmental agency for:
(a) The privilege of connecting to a system for which there is no immediate specific requirement for a capital improvement, expansion or installation at the utility source necessitated by the connection; or
(b) An assessment imposed on board-owned property for the installation of a contiguous utility line except for that length and size of line actually needed to service the educational or ancillary plant on that site; or
(c) For an intangible service which is not clearly established at a cost.
This definition is one of ninety promulgated in connection with implementation by the State Department of Education of Chapter 235.
The principal witness on the nature of the fees here at issue was Roger Anderson, appellant's executive director. He testified the design capacity of the existing sewer system is four million gallons per day. This system was already seen to be insufficient in some respects in 1981.
Anderson said the capital charges include a plant charge which is the figure to amortize the cost of the treatment facility and the facilities to get rid of its products. He said the line charge is the charge for the transmission system; the operating charges after a party is hooked onto the system are costs of handling that user's sewage and of maintaining the transmission and plant facilities, and the standby charges are for maintenance of that portion of the plant and system allocated by contract to a development or project not yet brought on line. These charges are calculated according to rule 31-10 of the Florida Administrative Code, and cover fixed, not variable costs. An equivalent connection is the equivalent of the capacity and use needed for a house with one toilet. The number of equivalent connections from the middle school was determined by multiplying the projected enrollment of the school by a per pupil factor determined by an earlier rate study.
Anderson further said that the standby charge is to cover fixed costs of the portion of the facility "in effect set aside" for the potential user, until the user comes on line and starts paying normal full operation charges. The standby charge under the rule is currently sixty-eight percent of the regular operation charges. He denied that the SAS charges are charges for intangible services; and he testified there was not in 1981, and there still was not when he testified, a line available to service the Jupiter middle school.
Anderson testified the line charges are not an assessment and have no relationship to contiguous utility lines, and that the plant connection charges are similar to the line charges in that they are determined by a method of apportionment of the capital cost of building the facilities among the customers according to the number of equivalent connections. While he denied that the plant connection charge is a charge for a privilege, he said that once it is paid, it is for the right to tie into the system.
Appellant argues the only meaningful testimony on the nature of the charges at issue was Mr. Anderson's; that Mr. Anderson testified these charges did not correspond to the definition of impact and service availability fees found in the pertinent rule, and that therefore the court could not properly find that the charges were impact and service availability fees.
Mr. Anderson's testimony is not wholly in support of appellant's position as appellant claims; and the question of whether the charges at issue are of the kind from which the School Board's school facilities *935 are exempted by the statute is not purely one of fact to be determined on the basis that there are certain uncontroverted statements in the testimony. Rather, it is either a question of law or a mixed question of law and fact. The "expert's" testimony, if Mr. Anderson was present as an expert, does not in these circumstances carry the weight appellant thinks it should carry.[1]
We conclude on the basis of Mr. Anderson's testimony, together with the obvious meaning of the rule definition of impact or service availability fees, the trial court properly determined the fees here at issue were in the nature of impact or service availability fees.
We find it astonishing that the appellant argues that a fee it denominates service availability standby charges is not a service availability fee. Generally, it is clear from Mr. Anderson's testimony that none of the fees in question are for present services or present use of facilities. He described the plant connection charge in a manner that puts it in the category of rule 6A-2.01(45)(a), even though that was not his intention. The service availability standby charge can be characterized as a charge for an intangible service for which there is no clearly established cost. The line charge is either a charge in advance for the line eventually to be constructed as the contiguous utility line, as the trial court found, or a charge for an intangible service for which there is no clearly established cost. Either way it is a fee from which the school is exempted by the amendment to section 235.26(1).
It is evident that all the wastewater lines needed on the middle school property have already been put there by the school board, and when the sewer system's southerly connector line is eventually installed there will be need only for a connecting link between the school's lines and the southerly connector line. There is no need for any specific capital expenditure by the Environmental Control District to accommodate the school's needs.

II

CONSTITUTIONALITY OF SECTION 235.26(1) FLORIDA STATUTES (1981)

A

ARTICLE III, SECTION 6
The Environmental Control Board's first ground for claiming that section 235.26(1), Florida Statutes (1981), which is unchanged to this day, is unconstitutional, is that the title of the statute inadequately reflects the content of this subsection. The title of the act is "State Uniform Building Code for Public Educational Facilities Construction." The provision of section 235.26(1) of which, according to the Environmental Control District, the title fails to give notice, is that which exempts public educational facilities from impact fees or service availability fees.
Article III, section 6, of the Florida Constitution states, in pertinent part, the following:
Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title. No law shall be revised or amended by reference to its title only. Laws to revise or amend shall set out in full the revised or amended act, section, subsection or paragraph of a subsection.
As Palm Beach County points out in its amicus brief, the language exempting public educational facilities from impact fees or service availability fees was added to section 235.26(1) by the passage in 1981 of section 27 of Chapter 81-223, Laws of 1981. The title of that legislative act, which goes on for pages, includes the words, "an act relating to educational facilities construction and funding; amending, creating and repealing various sections in *936 Chapter 235, Florida Statutes ... modifying certain standards relating to safety, sanitation, sites, coordination of local construction planning, facilities design, construction techniques, new construction, day labor projects and the State Uniform Building Code ... revising and readopting certain sections of Chapter 235, Florida Statutes... ."
The Environmental Control District Board argued at trial that either the impact fees and service availability fees language inserted in section 235.26(1) refers only to building  related fees and not to utility rates and charges, or it is in violation of Article III, section 6 of the Florida Constitution. The reasoning behind this position is that the sole subject of section 235.26 is construction of public school buildings, and subsection (1) of that section requires school boards to apply the uniform building code and exempts them from the application of local building codes, building regulations and related fees. If, however, the fee language applies also to utility fees, appellant contends, then a different subject has been introduced, contrary to the strictures of article III, section 6, Florida Constitution.
We think, but do not say, that inclusion of section 27 as part of Chapter 81-223, Laws of 1981, was fairly in conformity with the requirements of article III, section 6, of the Florida Constitution. However, we need not consider that question. Article III, section 6 applied only so long as the subject statutory provision remained a "law." Once the provision was reenacted as a portion of the Florida Statutes, it was not subject to challenge under Article III, section 6. State v. Combs, 388 So.2d 1029, 1030 (Fla. 1980); Santos v. State, 380 So.2d 1284, 1285 (Fla. 1980).

B

VOID FOR VAGUENESS AND AMBIGUITY
Appellant's second ground for the unconstitutionality of the subject statutory provision is that it does not fairly convey what the exemption is from, because there is no definition of "impact fee" or "service availability fees" in the statute or elsewhere in the legislated laws of this state. The Environmental Control District contends that even the definition of "impact or service availability fees" found in the Florida Administrative Code at Rule 6A-2.01(45) is vague and ambiguous.
Before proceeding further in analyzing this issue, we should note that a statute that does not seek to impose significant sanctions is not subjected to as fine a scrutiny as a prohibitory or criminal statute. Department of Legal Affairs v. Rogers, 329 So.2d 257 (Fla. 1976). In statutes regulating business activities, the use of special or technical words or expressions well enough known to those who will need to use them, or of words having a well-settled common law meaning, is generally immune to a charge of vagueness. Even statutes dealing with hard-to-define offenses have been treated sympathetically by the United States Supreme Court when the First Amendment has not been implicated. Id. at 264 (quoting State of Washington v. Reader's Digest Association, 81 Wash.2d 259, 501 P.2d 290 (1972)).
It appears to us that agencies like the Environmental Control District here know very well what the subject language refers to, even without the administrative agency definition. The developer's agreement proposed to the School Board in this case by appellant itself employs such language as "service availability standby charges." The appellant knows what is meant by the terms it attacks, even without reference to the definition in the administrative rules; and its attack on the lack of definition for certain terms used in the administrative rule definition of impact or service availability fees appears to be hypercritical and disingenuous. The amicus of appellant, Palm Beach County, seems to have no problem understanding the statutory terms, for it seeks in its brief to exclude from the statutory exemption from the imposition of such fees, those imposed by publicly owned utilities, as distinguished *937 from those imposed by governing bodies of cities and counties.
Appellee argues that the statutory amendment was adopted explicitly in response to the holding in School Board of Pinellas County v. Pinellas County Commission, 404 So.2d 1178 (Fla. 2d DCA 1981), that section 235.26(1) as then written did not exempt school boards from payment of water and sewage impact fees. It appears that the appellate decision was actually rendered later than the enactment date of the section 235.26(1) amendment, but the legislature may have been aware of the proceedings. There is no reason to suppose the legislature meant to include in the exemption only impact fees of public agencies other than publicly owned utilities; it could surely have qualified the term if it so intended. If the legislature was reacting to the above proceedings, the legislature reasonably meant to include impact fees for sewer and water services in the amendatory exemption. Appellee provides us with no authority respecting the exemption's legislative history.
Appellee also points out that this court in Home Builders v. Board of Palm Beach County Commissioners, 446 So.2d 140 (Fla. 4th DCA 1983), evinced no difficulty in understanding the meaning of the term in the county's impact fee ordinance. Actually, at least in counties that are experiencing rapid growth, a great many lay people have a good grasp of the meaning of the term.
As for appellant's attack on the undefined terms used in the administrative rule definition of impact or service availability fees, words and phrases like "privilege" and "intangible service" are obviously used in the same way such terms are used in everyday language; so that one who is unfamiliar with them can readily determine their referents by using a standard English dictionary. If an administrative agency or legislative body were required to define terms whose meaning is readily ascertainable from ordinary usage or usage in the trade, it could hardly promulgate any law or rule. Cf. State v. Brown, 412 So.2d 426 (Fla. 4th DCA 1982) (statute using term "nonconsumable" not unconstitutionally vague, because term's reasonable meaning was applicable).
In its amicus brief the county argues in effect the State Department of Education was trying to arrogate to itself the power to regulate public utilities by drawing up the regulations of which the pertinent definition here is a part. The Department of Education clearly is the agency charged with administering the Florida School Code, of which Chapter 235 is a part; and as to the claim that statutes pertaining to public utilities  sections 153.11(1)(b) and 184.09(1)(a)  prohibit regulation of such utilities by state agencies, it should be noted that section 235.26(9) states in terms that "[a]ll special acts or general laws of local application are hereby repealed to the extent that they are in conflict with this section." Appellee points out a similar statutory provision was found to have conferred valid regulatory authority on the State Public Service Commission when a preexisting statute restricted such regulatory authority to the Board of County Commissioners only. See Deltona Corporation v. Florida Public Service Commission, 220 So.2d 905 (Fla. 1969). Further discussion of this sub-issue is found at issue I E below.

C

EQUAL PROTECTION
Appellant urges that if the statutory provision here under scrutiny exempts school board construction from impact fees imposed by publicly owned utility providers, the legislature has made a classification that violates the equal protection clause of the Florida Constitution. The reasoning is that the provision is discriminatory because the exemption does not extend to impact fees imposed by privately owned utility companies.
It is obvious we are not looking at a "suspect" classification, such as race, or abridgment of a fundamental right, such as freedom of speech. Hence the test is not one of strict scrutiny, but only whether *938 there is a rational basis for the classification made by the legislature; that is, does the classification bear some rational relationship to a legitimate state purpose. E.g., In re Estate of Greenberg, 390 So.2d 40 (Fla. 1980), appeal dismissed sub nom Pincus v. Estate of Greenberg, 450 U.S. 961, 101 S.Ct. 1475, 67 L.Ed.2d 610 (1981). The burden is on the party challenging the statute to show there is no conceivable factual predicate rationally able to support the classification being attacked. The Florida High School Activities Association v. Thomas, 434 So.2d 306, 308 (Fla. 1983). That the statute results in some inequality will not invalidate it; the statute must be so disparate in its effect as to be wholly arbitrary. E.g., Greenberg, 390 So.2d at 42. It is not the court's function to determine whether the legislation achieves its intended goal in the best manner possible, but only whether the goal is legitimate and the means to achieve it are rationally related to the goal. Khoury v. Carvel Homes South, Inc., 403 So.2d 1043, 1045 (Fla. 1st DCA 1981).
It is not hard to find a legitimate goal for the subject provision and a rational relation of the present classification as a means toward achieving that goal. Public school construction is often urgently needed, but puts a heavy financial burden on the taxpayers of the locality and state, in part because special attention must be given the protection of children's health and safety. It is a legitimate legislative goal to keep such construction costs within reasonable bounds. Exempting school facilities under construction from impact fees imposed by other public agencies can help limit these construction costs. In as much as both school districts and sewer districts are creatures of the people and regulable by the legislature, it is logical for the legislature to decide not to require money needlessly to pass from one agency to the other in the form of impact fees. To the extent that publicly owned utilities are naturally in the same class as privately owned ones, but have been separately classified here for the purpose of the impact fee exemption, the legislature may have reasoned that although privately owned utilities frequently perform the same services as publicly owned ones, the former are franchised, and serve areas different from those served by the publicly owned ones. There is thus no competition between publicly owned and private utilities; hence no competitive advantage is given the private utilities by the fact they may collect impact fees from new public schools whereas the publicly owned utilities may not. As to the argument based on the discriminatory impact on customers of the utilities under the two different forms of ownership (1) it is doubtful the Environmental Control Board has standing to argue on the customers' behalf; (2) the comparison must be between the sewer district and, say, the power company, which arguably are apples and oranges and not of the same natural class, and (3) the customers are, by and large, the same people, so that the classification argument is at best academic. It should be remembered that a statutorily created classification need not be perfect; nor must the legislature, in the interest of equal protection, either solve all facets of a problem at once or leave the problem wholly unsolved. See Greenberg, 390 So.2d at 46.
It has also been said that if a legislative enactment affects members of the same class equally, and has a reasonable relation to a legitimate state interest, the enactment is constitutional. See LeBlanc v. State, 382 So.2d 299 (Fla. 1980). Here, publicly owned utilities are affected by the exemption in the same way, and the relation to a legitimate state interest has already been shown. If publicly owned utilities are not perceived as sharing a class with privately owned ones, then there is no equal protection issue.
Appellee analogizes to Home Builders, wherein it was held that provision for the setting of impact fees in different amounts in different parts of the county did not deny equal protection to county residents. There, ironically, it was the county, of course, that was defending the provision of its ordinance against attack *939 for denial of equal protection. The ordinance attacked in Home Builders allowed municipalities to opt out of the fee impact ordinance, and the great majority of the county municipalities did so. This court held that equal protection was not offended by unequal charges or fees assessed in incorporated and unincorporated areas, so long as the legislative body had authority to enact the legislation. If the present sub-issue refers to the fact the exemption may create disparity in costs to users in the Loxahatchee River Environmental Control District as compared with those to users where there is a privately owned sewer system, the reasoning of Home Builders seems equally applicable here. Territorial uniformity is not a blanket constitutional requirement. See Wednesday Night, Inc. v. City of Fort Lauderdale, 272 So.2d 502 (Fla. 1973).
Finally, appellee correctly points out that under subject statute school boards are not exempted from charges for actual capital outlay made by the utility in order to provide a school with service, or charges for the service itself. Thus other customers will not be picking up the direct actual costs of service provided here to the Jupiter middle school  if and when the Environmental Control Board actually provides such service to that educational facility.

D

DUE PROCESS
Appellant claims that by allowing the School Board to receive services and use facilities furnished by the Environmental Control District without paying for them the legislature is depriving the appellant and its customers of property without due process of law. Appellant says the legislature failed to give appellant notice or a right to be heard.
Appellee points out that the exemption applies only to fees that are charged for other than direct service or actual facilities. Capital costs the Environmental Control District may in future incur in order to hook up the school to its system, the school district must reimburse, and fees for actual waste water service, the school district will have to pay.
A court may hold a legislative enactment to be a deprivation of property without due process of law only when the statute bears no reasonable relationship to a permissible legislative object and is arbitrary and unreasonable or oppressive as it adversely affects those property rights. See Johns v. May, 402 So.2d 1166 (Fla. 1981); Heller v. Abess, 134 Fla. 610, 184 So. 122 (1938). This is essentially the same test as we have applied in analyzing the alleged equal protection ground. To exempt a school board from payment of fees for potential impact of public school facilities on public utility facilities in order to keep down capital outlay for schools reflects a legitimate legislative object. Because impact or service availability fees are more nearly "guesstimates" of cost effects on needed future capacity than reflections of actual costs, it is virtually impossible to show the adverse effect on the property rights of others, if any, of the exemption of public school facilities from such fees. Thus the effect on other system users of the present statutory amendment cannot be seen as arbitrary, unreasonable or oppressive.
The time of substantive due process is long gone. The courts no longer second guess the wisdom or efficacy of legislation. That seems to be what appellant wished the trial court to do, and now asks this court to do.

E

AMENDMENT OF SPECIAL ACT BY NONCOMPREHENSIVE GENERAL ACT
As already pointed out at issue I B, there is a provision in section 235.26 repealing any existing contrary statutory provisions whether in special or general laws of local application. Section 235.26(9). The succeeding subsection bars subsequent passage of local laws contradictory to any provision of the state building code. It is *940 obvious that the legislature intended to modify existing laws governing assessments by publicly owned public utilities.
Appellant shows us no constitutional authority for the proposition that a noncomprehensive general act may not, without specific reference to a prior special act, alter that special act. Appellant does cite case authorities; these appear to be inapposite, however, as they deal with cases where a new statute appears to conflict with a prior one but the repeal, if any, is by implication only. Here, while section 235.26 does not specify the prior conflicting statutes whose conflicting provisions it repeals, it does state in so many words that any such conflicting statutory provisions are repealed. We think a clear intent to repeal is apparent here, which would satisfy one of the rules stated in In re Wade, 150 Fla. 440, 7 So.2d 797 (1942).
It may, in fact, be reasoned that there is no repugnancy between chapter 71-822, Laws of Florida, which created the Environmental Control District, and the present statutory provision. That is, the power of a utility to set and collect reasonable fees and charges for services and facilities it furnishes and for making connections and for use of same, such fees and charges to be subject to supervision by no state, county or sanitary district, need not be construed as in conflict with a statutory provision that exempts public educational facilities from impact and service availability fees. Impact and service availability fees need not be considered to be, in the language of the enabling law, fees or charges for services and facilities furnished by appellant's system. It can reasonably be argued  albeit we do not here so hold  that the enabling law provisions on which appellant relies refer only to fees for actual services provided and use of facilities already in being. Impact fees are not of this nature.
Even if under the special enabling law the Environmental Control District has the power to set impact fees and therefore the amendment to section 235.26(1) modifies that power, there is surely no conflict between the latter statute and the enabling law provision that the Environmental Control District shall not be subject to state or local agency supervision or regulation. Exemption of school facilities from certain charges does not give the Department of Education or the School Board the power of supervision or regulation; and the legislature is not a governmental agency. Obviously appellant was created by the legislature, and is subject to its authority.
In its reply brief the county says, in effect, that even if section 235.26(9) indeed repeals all special acts or general laws of local application to the extent they conflict with section 235.26, the section has no effect on three provisions in the statutes that are general laws of general application  sections 153.83, 153.11(1)(b) and 180.13(2). This is true. Let us examine these sections to see whether there is a conflict between the subject statutory exemption and any of these.
Section 153.83, insofar as is here pertinent, prohibits county sewer districts from rendering free sewer services or from discriminating among "users of the same class" in the rates, fees and charges. Specifically, the same rates, fees and charges are to be fixed and collected from a school district as from other users of such facilities in the same class.
Rates, fees and charges are not defined in section 153.52, the definitions section of the county water and sewer systems statute, but are explained at section 153.64, wherein is also found a nondiscrimination provision as to users of the same class, section 153.64(2). The subsection provides:
(2) Such rates, fees and charges shall be just and equitable and uniform for users of the same class and where appropriate may be based or computed either upon the quantity of water consumed or upon the number and size of sewer connections or upon the number and kind of plumbing fixtures in use in the premises or upon the number or average number persons residing or working in or otherwise using or occupying such premises or upon any other factor affecting the use *941 of the facilities furnished or upon any combination of the foregoing factors as may be determined by the district board on any other equitable basis.
What little case law there is tends to support the construction we put on this language, that it refers explicitly to charges for use or service of the sewer system. See Kixmiller v. City of Naples, 317 So.2d 101 (Fla. 2d DCA 1975) (Provision of agreement between water and sewer district leasing facilities to city that gave city power to establish rates for water and sewer services provided from the facilities were illegal delegation of rate fixing powers statutorily vested in the district). While this is far from conclusive, it is reinforced by the following. Section 153.73 authorizes levying of special assessments upon benefited property when the district constructs or reconstructs "assessable improvements." These are defined at section 153.52(7) as follows:
(7) "Assessable improvements" shall mean that portion or portions of a sewer system or a water system of a local nature and of benefit to the premises or lands served thereby and particularly, without limiting the generality of the foregoing, with reference to a sewer system, shall include, without being limited to, laterals and mains for the collection and reception of sewage from premises connected therewith, local or auxiliary pumping or lift stations, treatment plants or disposal plants, and other appurtenant facilities and equipment for the collection, treatment and disposal of sewage; and with reference to a water system shall include such mains and laterals and other distribution facilities, pumping stations, and sources of supply as are of benefit to the property served by such water system together with incidental equipment and appurtenances necessary therefor.
It is clear that these are separate and distinct from rates, fees and charges, and sections 153.64(2) and 153.83 anti-discrimination provisions are inapplicable to these assessments. The fees here in question are apparently not assessments as defined at section 153.52(7), but they are not, either, "rates, fees and charges" as intended at sections 153.64(2) and 153.83. Thus we do not think section 153.83 in any way conflicts with the subject amendment to section 235.26(1). Moreover, it may be argued that even if section 153.83 were applicable, it would not be violated by the exemption of a school board's new facilities from payment of impact or similar fees, in that such users are in a class by themselves. The statute prohibits discrimination in fees charged to users in the same class.
Section 153.11(1)(b) is the statutory section which says the rates fees and charges of county water and sewer districts are fixed by the county commission and not subject to supervision or regulation by any other state or county agency. Obviously as already indicated the subject amendment does not conflict with that, as the legislature is not such an agency and the exemption provision here under attack does not give the school board supervisory or regulatory authority. Section 180.13(2) authorized fixing and collecting of municipal utilities rates and charges. We do not understand in what way it is contended that the subject amendment conflicts with this statute.

F

COMITY
Appellant seems to think that Florida's various governmental agencies  at whatever levels  bear to each other a relationship similar to that which exists among various judicial jurisdictions in the United States. That relationship among United States jurisdictions derives from the fact that the United States Constitution originated, at least in theory, as a compact among sovereign states, and, while voluntary, may be influenced by the Constitutional requirement that each state give full faith and credit to the public acts, records and judicial proceedings of every other state. Article 4, section 1, United States Constitution. Comity may also have an existence separate *942 from what we have described; but it hardly has application in the manner appellant suggests. Surely the legislature is not prevented by any real or fancied comity between the Palm Beach County School Board and the Loxahatchee Environmental Control District from deciding that new public school facilities are exempt from the latter's impact or service availability fees. Even if some sort of deference should be shown by one public agency in the state toward another, the legislature is unaffected by this principle, for it is the creature of the people of the sovereign state of Florida, free to legislate within the limits set by the people in the Florida constitution. The legislature need not defer to a public utility agency it created!
Also, as stated in analysis of another sub-issue, exempting the School Board from certain fees not clearly connected with facilities or services provided to it does not constitute subordination of the Environmental Control District to the School Board, as appellant insists on depicting it.
Finally, if the principle of comity did indeed apply as between school boards and sewer districts, would not comity just as reasonably justify exemption of school boards from sewer districts' impact fees?
For all the reasons set out above, we affirm the trial court's judgment.
ANSTEAD, J., and WARNER, MARTHA C., Associate Judge, concur.
NOTES
[1] The School Board presented in support of its position a summary judgment rendered in Volusia County in a similar case, and an attorney general's opinion rendered in 1984, AGO 84-11. These need not carry great weight.